UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Claire Ferrara,

    Plaintiff and Counter
    Defendant,

v.

Todd J. Ferrara, *individually and as trustee of the Todd J. Ferrara Trust*,

    Defendant, Counter Claimant,
    and Third-Party Plaintiff,

v.

Theodore Ferrara,

    Third-Party Defendant.

File No. 25-cv-2142 (ECT/JFD)

**OPINION AND ORDER**

---

Carol R.M. Moss, J. Robert Keena, Nicklaus Johnson, Hellmuth & Johnson PLLC, Edina, MN, and Christopher C. Grecian, Parker Daniels Kibort LLC, Minneapolis, MN, for Plaintiff and Counter Defendant Claire Ferrara.

K. Jon Breyer, Leland Patrick Abide, Kutak Rock LLP, Minneapolis, MN, for Defendant, Counter Claimant, and Third-Party Plaintiff Todd J. Ferrara.

Mark Bradford, David E. Camarotto, Elizabeth Euler, Bradford, Andresen, Norrie & Camarotto, Bloomington, MN, for Third-Party Defendant Theodore Ferrara.

---

    This case involves an ownership dispute over a family business. Todd and Ted Ferrara jointly owned Standard Heating & Air Conditioning until Ted passed down his half of the company to his daughter Claire. Todd agreed to provide Claire a call option, which allowed Claire to purchase the rest of the company from Todd after a certain date at a

certain price. When Claire tried to exercise the call option, Todd refused to sell her his shares on the grounds that, while her proposed purchase price followed the method established in the written contract, Claire, Ted, and Todd had all orally agreed to use a different method of valuation—an independent appraisal. Claire sued Todd for specific performance, and Todd counterclaimed. Todd brought a third-party claim against Ted, alleging that Ted duped him into believing the call option purchase price would be set by appraisal, and that Ted induced Claire to breach the contract. Ted moves to dismiss Todd's third-party complaint under Federal Rule of Civil Procedure 12(b)(6).

The motion will be granted. The misrepresentation claims fail because Ted owed no duty to Todd, Ted's false statements concerned non-actionable future events, and Todd has not pleaded damages. The tortious-interference-with-contract claim fails to plausibly allege that Ted induced Claire to breach the contract.

I[1]

Tony Ferrara founded Standard Heating & Air Conditioning, Inc., in 1930. Am. Third-Party Compl. [ECF No. 20] ¶ 6. He passed down shares in the company to his nine children, including his sons Todd and Ted. *Id.* ¶ 7. By 2007, after the company had undergone several mergers and acquisitions, Todd and Ted were the company's sole shareholders, each owning 50%. *Id.* ¶¶ 9–12. Todd was Vice President and Secretary, and Ted was Chairman of the Board and CEO. *Id.* ¶ 13. In 2017, Ted's daughter, Claire, began

---

[1] In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from the amended third-party complaint and materials it necessarily embraces. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

to work at Standard. *Id.* ¶ 14. About a year later, she became CEO, and Ted transitioned to the role of "Advisor to the CEO." *Id.*

On September 1, 2019, Ted, Todd, and Claire agreed to a Shareholder Transfer Agreement, and Todd and Claire agreed to its incorporated First Amended Share Purchase Agreement, which together contained three provisions relevant here. *Id.* ¶ 15; *see* ECF No. 25-1.[2] First, Ted gifted all his shares to Claire. Am. Third-Party Compl. ¶ 15; ECF No. 25-1 at 2 ¶ 2. The accounting firm Lurie, Besikof, Lapidus & Company, LLP appraised the July 31, 2019 value of Ted's shares at $1,784,900, which meant the value of the entire company at that time was $3,569,800. *Id.* ¶ 16; ECF No. 25-1 at 1–2 ¶ 1. Second, Todd agreed to sell 200 non-voting shares to Claire, so Claire became the company's majority owner.[3] Am. Third-Party Compl. ¶ 17; ECF No. 25-1 at 5 ¶ 19. Third, the Agreement created a call option. Am. Third-Party Compl. ¶ 18; ECF No. 25-1 at 2–3 ¶ 7. Under that provision, Claire gained "the option to purchase all, but not less than all, of Todd Ferrara's shares" starting December 31, 2024. Am. Third-Party Compl. ¶ 19; ECF No. 25-1 at 2 ¶ 7. The call option had "no specific time limit," and Claire could exercise it up to her death. ECF No. 25-1 at 2 ¶ 7.

The call option purchase price was set to be "the fair market value of the Todd Ferrara Shares as determined pursuant to Section 6 of the First Amended Share Purchase

---

[2]   Both contracts are necessarily embraced by the pleadings and may be considered on a motion to dismiss. *See Zean*, 858 F.3d at 526.

[3]   Standard Heating & Air Conditioning had a total of 20,000 shares. *See* Am. Third-Party Compl. ¶ 10. So Claire's purchase of 200 shares, added to the 10,000 shares gifted from her father, made her the 51% owner.

Agreement." *Id.* Section 6 provided two ways to calculate fair market value. *Id.* at 11 § 6.01. The first way was to apply the value determined by the shareholders at the annual meeting. *Id.* at 11 § 6.02. That provision reads:

> Contemporaneously with each annual meeting of the Shareholders of the Corporation commencing in 2019 or at such other time as the Shareholders may agree in writing, to [sic] the Shareholders shall set the Fair Market Value of the Shares by taking into consideration the factors set forth in Section 6.03(e), below. The determination or redetermination of such Fair Market Value shall be made by the unanimous consent of the Shareholders in writing and shall be reflected on a Re-determination of Value Certificate . . . which shall be signed by all of the Shareholders. The Fair Market Value of the Shares determined in the manner provided in this Section 6.02 shall be binding for the purposes of this Agreement except to the extent set forth in Section 6.03.

*Id.* The second valuation method applied when there was no "re-determination of the Fair Market Value of the Shares pursuant to Section 6.02 within fifteen (15) months prior to a valuation Date." *Id.* at 12 § 6.03. In that case,

> the Fair Market Value of the Shares shall be determined as follows, with the term "Fair Market Value" being the price that a ready, willing and able buyer, who is interested but not desperate, would pay, and a ready, willing and able seller, who is interested but not desperate, would accept.

*Id.* That value would be determined by agreement between the transferring shareholder and the corporation, or—if they did not agree on the fair market value—by an independent appraisal. *Id.* at 12 § 6.03(a)–(b). Section 6.03 of the Agreement also stated, "[i]t is the intent of the parties that Fair Market Value shall take into account all discounts for lack of marketability, restrictions on transfer, and the like, but will not take into account any minority interest discount, or discount for lack of control." *Id.* at 12 § 6.03(e).

4

Standard "had a history of declaring very low valuations of its shares in its annual determination of value." Am. Third-Party Compl. ¶ 25. It did so to anticipate one owner's death—the surviving owner could buy the remaining shares at a low price, and the company would stay in the Ferrara family. *See id.* The 2019 Lurie Besikof valuation of $3,569,800 was low because the firm discounted "for lack of marketability," forbidden under Section 6.03(3). *Id.* ¶¶ 22–23. Undervaluation was Ted's idea, and Todd "agreed the practice was reasonable." *Id.* ¶ 26. In 2020, however, Todd had misgivings when he was asked to sign a Re-determination of Value Certificate. *Id.* ¶ 24.

Nevertheless, Todd agreed to sign the Certificate after Ted "proposed" "that the figure would not be used to determine the value of Todd Ferrara's shares under the Call Option." *Id.* ¶¶ 27–28. "Todd Ferrara and Claire Ferrara agreed with Ted's suggestion, and Ted Ferrara recited to Claire Ferrara that the Call Option price would need to be based on the fair market value as determined by an appraiser. Claire Ferrara agreed." *Id.* ¶ 27. Over the next few years, Claire and Todd (the only two shareholders) agreed to a deflated value. *Id.* ¶ 28. In April 2024, the Re-determination of Value Certificate set the company's value at $6,400,000. *Id.* ¶ 44. Todd understood that the agreed-upon number would not be used for the call option, as it was "simply a number [Ted chose], without any consideration of the actual Fair Market Value," *id.* ¶ 29.

Two meetings were held in mid- to late-2024 to discuss the call option. *Id.* ¶¶ 33, 35. In August 2024, Ted met with Todd and Todd's counsel, and Ted asked Todd about the expected price of the shares. *Id.* ¶¶ 33–34. Todd didn't have a number in mind, and he "indicated that he [Todd] would obtain [an appraisal] and propose suggested terms of the

5

sale," to which Ted agreed. *Id.* ¶ 34. In December 2024, the three of them met again, this time with Claire joining. *Id.* ¶ 35. Ted wanted to know the price of the shares, and Todd "advised that he was working on it, but he wanted to discuss alternative means to the Call Option, including a partial purchase of [Todd's] shares and an agreement to sell additional shares in the future." *Id.* "Claire and Ted Ferrara were open to the concept." *Id.* Ted also asked if Todd had a suggested value for the company, and Todd "deferred." *Id.* ¶ 36. Ted said he believed the "shares would be somewhere between '4 million and 6 million' dollars" in value. *Id.* ¶ 37. Throughout the discussions, Claire and Ted never "suggest[ed] the purchase price should be based upon the Redetermination of Value Certificate." *Id.* ¶ 38. "In fact, Ted and Claire Ferrara stated that they preferred to negotiate a price that was fair to Todd Ferrara, Claire Ferrara and the Company." *Id.*

On March 3, 2025, Claire attempted to exercise the call option for $3,569,800. *Id.* ¶ 44. This determination was based on the April 2024 Re-determination of Value Certificate, which valued the company at $6,400,000.[4] *Id.* Todd refused to sell his shares. *Id.* ¶ 45. In May 2025, Claire sued Todd for specific performance, Am. Compl. [ECF No. 6], and Todd counterclaimed, Answer & Counterclaim [ECF No. 8].

Todd also sued Ted in a third-party claim under Rule 14. The operative Amended Third-Party Complaint raises four causes of action, though only two claims remain. The live claims are Negligent/Intentional Misrepresentation, Am. Third-Party Compl. ¶¶ 60–

---

[4] It doesn't ultimately matter, but the allegations are inconsistent. The most recent Re-determination of Value Certificate set each share's value at $320. Am. Third-Party Compl. ¶ 44. Todd's 9,800 shares were therefore worth $3,136,000. Claire's attempted purchase of Todd's shares for $3,569,800 would be a contractual overpay.

67, and Tortious Interference with Contract, *id.* ¶¶ 74–82.[5] Ted moves to dismiss for failure to state a claim upon which relief may be granted. ECF No. 22; *see* Fed. R. Civ. P. 12(b)(6).

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, Fed. R. Civ. P. 12(d), but not when the relevant materials are "necessarily embraced" by the pleadings, *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). "In general, materials embraced by the complaint include

---

[5] The dismissed claims are Breach of Fiduciary Duty against the company, Am. Third-Party Compl. ¶¶ 55–59, and Promissory Estoppel against Ted Ferrara, *id.* ¶¶ 68–73. Todd voluntarily dismissed the former without prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. ECF No. 38 at 1. That means there are no remaining claims against Third-Party Defendant Standard Heating & Air Conditioning, Inc.; that party has been terminated from the case. In his brief, Todd stated that he "and the Trust will voluntarily dismiss the promissory estoppel claim," and he confirmed that intention at the hearing. ECF No. 33 at 2 n.1.

7

documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Id.* (citation modified). When a contract is the basis of the dispute, that contract is necessarily embraced by the pleadings and may be considered. *See id.* at 526–27.

III

A

The Shareholder Transfer Agreement provides that it "shall be governed and construed in accordance with the laws of the State of Minnesota." ECF No. 25-1 at 5 ¶ 16. The parties agree that Minnesota law applies. *See* ECF No. 27 at 7 n.5; ECF No. 33 at 8–20 (applying Minnesota cases). Under Minnesota law, negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012) (quoting Restatement (Second) of Torts § 552 (A.L.I. 1977)). "To succeed on a negligent misrepresentation claim, a plaintiff must establish '(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information.'" *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 623 (8th Cir. 2017) (quoting *Williams*, 820 N.W.2d at 815). Negligent misrepresentation is a fraud claim that

must be pleaded with particularity. *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

It is an open question whether Minnesota recognizes the tort of negligent misrepresentation in arm's-length commercial transactions. *See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 370 n.7 (Minn. 2009). Although the Minnesota Supreme Court has not ruled on the issue, the Minnesota Court of Appeals has repeatedly held that, "where adversarial parties negotiate at arm's length, there is no duty imposed such that a party could be liable for negligent misrepresentations." *Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424 (Minn. Ct. App. 2000) (quoting *Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 871 (Minn. Ct. App. 1995)); *see Thompson v. Riess*, No. A18-1110, 2019 WL 510034, at *5 (Minn. Ct. App. Feb. 11, 2019). Thus, in the absence of a showing of disparity in bargaining power or business sophistication, a claim for negligent misrepresentation "cannot succeed." *Ascente Bus. Consulting, LLC v. DR MyCommerce*, No. 18-cv-138 (JNE/KMM), 2018 WL 3597674, at *6 (D. Minn. July 26, 2018); *see Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 543–44 (D. Minn. 2021) (collecting cases in this District).

The negligent misrepresentation claim fails for three reasons. First, Todd has not plausibly alleged facts showing Ted owed him a duty of care. Todd admits that Ted owed him no "formal legal relationship giving rise to a special duty." ECF No. 33 at 15; *see Williams*, 820 N.W.2d at 816 (recognizing duties of accountants to clients, attorneys to clients, guardians to wards, and directors to corporations). Instead, Todd relies on

9

*Minnesota Pipe & Equipment Co. v. Ameron International Corp.*, 938 F. Supp. 2d 862, 872 (D. Minn. 2013), to argue that the brothers' relationship was "more collaborative than adversarial," and on *Safeco*, 531 N.W.2d at 871–72, to argue that Ted provided guidance to Todd.  ECF No. 33 at 16 ("Ted had superior knowledge, skills, and information regarding the value of the shares, the interplay between the Redetermination of Value Certificate, the Call Option and, most importantly, his daughter Claire's intent to force the sale of the shares to her at a deflated value.").  The Amended Third-Party Complaint, however, does not plead facts making it plausible that Ted collaborated with or guided Todd as described in *Minnesota Pipe* and *Safeco*.  Both Ted and Todd had lengthy business experience: They jointly owned Standard Heating & Air Conditioning from 1990 to 1998, navigated several mergers and acquisitions, and held high-level positions within the company—Todd the Vice President and Secretary, and Ted the Chairman of the Board and CEO.  Am. Third-Party Compl. ¶¶ 8–13.  In short, they were sophisticated businessmen.  As for Ted's knowledge and skills, he "developed and advanced" the undervaluation method and "proposed" to use the artificially low price only for "valuing the shares of a deceased owner" and not as the call option purchase price, and Todd "agreed" with this approach.  *Id.* ¶¶ 26–27.  Todd independently approved Ted's suggestions—he "agreed the practice was reasonable."  *Id.* ¶ 26.  In December 2024, Ted "pressed Todd" to provide a suggested value of the company, and Todd agreed to "present an offer sheet that included the value per share, the share sale schedule, and terms for Todd Ferrara's continued employment."  *Id.* ¶ 36.  Those allegations don't suggest a significant skill or knowledge gap or describe the kind of guidance a lawyer or accountant provides to a client.  Instead,

10

the amended third-party complaint presents Todd as business professional, capable of independent judgment. It's conceivable that Ted "had special knowledge of material facts about Claire Ferrara's intent to exercise the Call Option" with the April 2024 share values, *id.* ¶ 64, but Todd's allegations don't make it plausible, *see Twombly*, 550 U.S. at 570.

Second, the Amended Third-Party Complaint does not plausibly allege that Ted provided false information. "Statements that are predictions about future events are not actionable in Minnesota as negligent misrepresentation claims." *Minnesota Pipe*, 938 F. Supp. 2d at 873 (citing *Trooien*, 608 F.3d at 1028–29, 1031); *Igbanugo v. Cangemi*, No. A10-2002, 2011 WL 2519205, at *4 (Minn. Ct. App. June 27, 2011) ("A representation or promise as to future acts or expectations may not form the basis of a claim for fraud or negligent misrepresentation."); *Rognlien v. Carter*, 443 N.W.2d 217, 220–21 (Minn. Ct. App. 1989). In *Rognlien*, the president of a car dealership offered the general manager position to a prospective hire, promising that the president's brother would not return as general manager. 443 N.W.2d at 218. After hiring the employee, the president reversed course, asked his brother to manage the dealership, and fired the new hire. *Id.* at 219. The defendant's predictions about what his family member would do in the future were "insufficient to support" a fraud claim, "[a]bsent any allegation" the defendant knew the family member would not take that action. *Id.* at 221.

Here, Todd says the false information was that the call option purchase price would not be based on the artificially low share valuation. ECF No. 33 at 14–15. That prediction is directly analogous to the one in *Rognlien*. Phrased in the active voice, Ted represented that Claire wouldn't rely on the 2024 company valuation. He "recited to Claire Ferrara

11

that the Call Option price would need to be based on the fair market value as determined by an appraiser." Am. Third-Party Compl. ¶ 27. He asked Todd what number Todd was seeking for his 49%, which would have been unnecessary had Ted planned to use the 2024 Re-determination value. *Id.* ¶ 34. He "stated that [he and Claire] preferred to negotiate a price that was fair to Todd," rather than base the call option purchase price on the Re-determination of Value Certificate.[6] *Id.* ¶ 38. Todd does not allege that at the time Ted made these predictions, he knew or negligently believed Claire intended to act otherwise. These predictions are not actionable on a negligent misrepresentation claim.

Third, Todd has not alleged a loss caused by justifiable reliance. *See Williams*, 820 N.W.2d at 815. Todd has not pleaded he lost anything of value related to the attempted exercise of the call option—he has not yet been forced to sell his shares.

B

In Minnesota, a plaintiff bringing a claim for intentional misrepresentation—also called fraudulent misrepresentation—must show that the defendant

> (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation.

---

[6] It's possible to interpret this statement as a false promise, rather than a prediction about the future. *See Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 9 (Minn. 1992) (Simonett, J., concurring in part and dissenting in part) ("[A] false promise is intentional misconduct."). To the extent it should be construed that way, it is considered as intentional misrepresentation.

12

*M.H. v. Caritas Fam. Servs.*, 488 N.W.2d 282, 289 (Minn. 1992) (citing *Florenzano v. Olson*, 387 N.W.2d 168, 174 n.4 (Minn. 1986)); *see Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-cv-609 (NEB/LIB), 2021 WL 5087273, at *7 (D. Minn. Mar. 5, 2021). This claim is also subject to the heightened Rule 9(b) pleading standards. *See Speed RMG Partners*, 2021 WL 5087273, at *8.

This claim fails for two of the reasons described above. First, the misrepresentations concerned Claire's future action, not a "past or present fact." *Caritas Fam. Servs.*, 488 N.W.2d at 289. One exception is Ted's stated preference "to negotiate a price that was fair to Todd." Am. Third-Party Compl. ¶ 38. Understood as a false promise, it does not support a claim for intentional misrepresentation. There are no allegations that Ted knew the statement to be false—that is, that he was lying about his preferences and intended all along to force or cajole Claire into imposing the artificially low call option purchase price. If anything, the allegations cut the other way. Todd claims that Ted is "*now* attempting to disavow the agreement . . . consummated in 2020 and reaffirmed multiple times." *Id.* ¶ 39 (emphasis added). Even if Ted's statement about his preferences could support an intentional misrepresentation claim, the fraud claim is not pleaded with particularity as required by Rule 9(b), as Todd does not allege specifically when Ted made the statement. *See* Am. Third-Party Compl. ¶ 38 (placing it "during months of discussions, phone calls and emails").

Second, an intentional misrepresentation claim requires damages. Todd has yet to sell his shares. So he has not plausibly alleged that Ted is liable to him for intentional misrepresentation.

C

A party may recover for the tort of intentional interference with contractual relations "by establishing (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982) (quoting *Royal Realty Co. v. Levin*, 69 N.W.2d 667, 671 (1955)). Generally, there is no tortious interference where there is no breach of the underlying contract. *See Qwest Commc'ns Co. v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018); *Royal Realty*, 69 N.W.2d at 671 n.4 (stating the tort occurs when the defendant commits "any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee" (quoting *Johnson v. Gustafson*, 277 N.W. 252, 254 (Minn. 1938))). With exceptions not relevant here, a party cannot interfere with its own contract. *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505–06 (Minn. 1991) (noting exception for a corporate officer acting outside the scope of his or her duties).

An initial barrier is that Ted was party to the Shareholder Transfer Agreement, which provided that the purchase price of Claire's call option would be set by the First Amended Share Purchase Agreement. ECF No. 25-1 at 2 ¶ 7. Ted was not party to the latter agreement. *See id.* at 17 (showing signature lines for Claire and Todd only). The parties have not cited any authorities discussing this situation—where a litigant is party to

14

the first contract but not to a secondary contract incorporated into the first. In any case, Todd alleges that Ted interfered with both agreements. Am. Third-Party Compl. ¶ 80.

Even if the *Nordling* rule didn't apply to the First Amended Share Purchase Agreement, Todd has not plausibly alleged Ted's tortious interference with a contract because he hasn't shown that Ted intentionally procured Claire's breach.[7] While it's true that tortious interference "allegations need not be highly specific," *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 761 (D. Minn. 2022) (citation modified), plaintiffs must still assert facts making an inference of liability plausible, *Iqbal*, 556 U.S. at 678. That hasn't happened here. Todd states in threadbare fashion that "Ted Ferrara exercises influence and control over his daughter Claire Ferrara and her transactions involving the Company." Am. Third-Party Compl. ¶ 77. Other than Ted's role as Claire's mentor, *id.* ¶ 14, there are no facts indicating Ted's influence and control over Claire. Todd also alleges that "Ted Ferrara intentionally caused Claire Ferrara to breach the agreements. In particular, Ted Ferrara made assurances that the Redetermination of Value Certificates would not be used in any future buy-out of Todd Ferrara's shares." *Id.* ¶ 78. That's a non sequitur. Ted's assurances about the company valuation have nothing to do with his influence over Claire. Next, "Ted Ferrara then induced Claire Ferrara to make a demand upon Todd Ferrara that he sell his shares for the value stated in the Redetermination of Value Certificate." *Id.* ¶ 79. There are no facts about Ted inducing Claire to do so. *See* Am. Third-Party Compl. ¶ 44 ("Claire Ferrara attempted to exercise her Call Option to

---

[7]  I assume without deciding that Claire breached the First Amended Share Purchase Agreement.

15

purchase all of Todd Ferrara's shares for $3,569,800 based on an April 15, 2024 Redetermination of Value Certificate . . . .").

Finally, as with intentional misrepresentation, Todd has not alleged damages. His tortious interference claim will be dismissed.

IV

Courts have discretion to decide between a with-prejudice and without-prejudice dismissal. *See Paisley Park Enters. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019). A dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend, *Milliman v. County of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sep. 26, 2013); *see Reinholdson v. Minnesota*, 01-cv-1650 (RHK/JMM), 2002 WL 32658480, at *5 (D. Minn. Nov. 21, 2002) (adopting R. & R.), or when the record makes clear that any amendment would be futile, *see Paisley Park*, 361 F. Supp. 3d at 880 n.7. On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *R. & R. adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).

Here, the better course is to dismiss the amended third-party complaint without prejudice. One ground for dismissal is that Todd lacks damages, as the call option has not been executed at the time of filing. If the call option is later executed at the contractual price, Todd may be able to plead damages. The other grounds for dismissal don't suggest amendment would be futile.

16

# ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Third-Party Defendant Theodore Ferrara's Motion to Dismiss Third-Party Complaint [ECF No. 22] is **GRANTED**.

2. The Amended Third-Party Complaint [ECF No. 20] is **DISMISSED WITHOUT PREJUDICE**.

Dated:  October 30, 2025                           s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court